Mr. Weber. Yes sir. Alright, you may proceed. Good morning, and may it please the court. I'd like to pose two scenarios to the court, if I may. In scenario one, Wells Fargo takes billions of dollars of assets and voluntarily places them in a UK trust, thus exposing the income from those assets to taxation in both the UK and the United States. And Wells Fargo would claim a statutory tax credit for the tax that it paid to the UK, so it would avoid double taxation. Transactions like this happen every day, and the IRS does not challenge them under the Economic Substance Act. Scenario two is the same as scenario one, except that a private party pays Wells Fargo $150 million over five years to do what I just described. If Wells Fargo is entitled to a foreign tax credit in scenario one, it must be entitled to a tax credit in scenario two because that transaction produced even more economic benefit for Wells Fargo. This case is scenario two. The government's only reason for invoking the non-statutory, judge-made doctrine of economic substance to deny Wells Fargo's statutory right to a foreign tax credit is that a British bank designed a transaction solely to enable it to get British tax credits from the British taxing authorities, but the economic substance doctrine does not exist to police perceived abuses of foreign tax systems by foreign companies. Counsel, isn't the BX payment, though, somehow linked to that tax payment, and doesn't Wells from Barclays' tax credits, and that's one of the issues I'm struggling with in this case, how to characterize the BX payment and how to take it into account as we're trying to analyze whether or not this is a sham transaction. Sure. Your Honor, the BX payment was calculated at the front end of the transaction partially in reference to Barclays' anticipated tax credits, all right? And it was a deal that either party could back out of on, I think, 30 days' notice, right? Correct. But if the BX payment is made, Wells Fargo is entitled to keep that even if Barclays doesn't get its tax credits. That is, if Barclays is denied the tax credits by the U.K. government. But presumably, if Barclays isn't getting the tax credits, Barclays is going to give notice under the agreement and the deal goes away. I mean, the deal is premised on these tax credits. The tax credits for Barclays from the U.K. government. Your Honor, I'd ask, how do we account for that BX payment? Does it come from the tax credits? The answer is no. And that's what the Federal Circuit said in another STARS case, Salem. It said, look, due to the fungibility of money, you can't trace those funds and say they came from Barclays' tax benefits in the U.K. any more than you could say they came from Barclays' general revenues or that they came from other tax credits. So how do you characterize the BX payment then? Remind me, I mean, how would you describe that in the context of the overall STARS transaction? The BX payment is just a straight-up payment from Barclays to Wells Fargo in exchange for Wells Fargo agreeing to engage in this transaction, mainly by putting its assets into a foreign trust and letting Barclays use those assets in a transaction in Britain to try to generate tax credits for Barclays. The BX payment is simply a payment to us, a cash payment to Wells Fargo. Now the government has tried to say, well, it actually is a reimbursement of the taxes that Wells Fargo paid to the U.K. Well, we disagree with that, but even if we take the government as being correct about that, they've got a problem. The Supreme Court's case in Old Colony said that when somebody else pays your tax obligation, that's income to you. And that's exactly what we're saying about this BX payment. It was income to Wells Fargo, and it was pre-tax income. We know that because we pay tax on it. But Old Colony's different. That's where you have an employer paying a tax that the employee owes, right? Yeah. In this case, the payment is based on a tax refund that Barclays has received. Is that correct? It's based, well, it's based on a composite, I believe, a total of tax benefits that Barclays was going to receive from the U.K. government. None of these benefits came from the U.S., I want to stress that. None of the benefits that Barclays got came from the U.S. taxing authorities. This is all happening over in Britain. But yeah, the BX payment was calculated by reference to that, and the Federal Circuit in Salem Financial said, that's fine. The fact that you calculate a payment by reference to a tax benefit or anything else doesn't make the payment a payment of tax benefits. It just, that's the formula by which you calculate the payment. But Salem Financial made it very clear, that's still a payment to Wells Fargo. That is still pre-taxed income to Wells Fargo, and not some sort of a tax effect. Again, because money is fungible, and we can't, nobody can trace where that money came from and say, that had to have come from Barclays' tax credit, or that had to have come from Barclays' deduction, or it came from Barclays' general funds. We just can't do that in any case. And therefore, you can't say that this money had to have come only from Barclays' UK tax benefit. And even if it had, that's Barclays' money to do with it what it was, right? When I get a tax refund from the government, I can use that money any way that I want to. I can give it to my kids, I can spend it on things. Nobody would say that I'm somehow funneling my tax payments or my tax refund to my kid if I just turn around and give it to them. That money becomes part of my general funds, and I can do with it what I want. And that's the same with Barclays. Once it got the tax benefits from the UK, it put those into its general funds and it made other payments, including the $150 million that it paid to us over a five year period. And that was absolutely income to Wells Fargo. Does the trust part of this have any other purpose other than to take advantage, to utilize, or maybe not take advantage, but to utilize the tax laws of the two countries to put these two banks in better financial position? It does not utilize, Your Honor, the differences in the taxation of the two countries. It utilizes British tax law. What happened is that Barclays found a way, under the way that the British tax laws are structured, that it could reap a lot of deductions and a lot of credits, all of which were legal in the UK at the time. But that was what Barclays did. It needed a trading partner to make that. It does take into account United States tax law because the net result of this, as I understand the argument, the net result of this is that Wells Fargo ends up actually getting kind of like a refund of this tax that they've paid in the UK. Isn't that the theory? Isn't that the argument here? That is their theory and it's absolutely dead wrong. Well, it's either dead wrong or it's the case in every foreign tax credit case. Let me explain that. The only way that you can get a foreign tax credit is to pay two taxes on the same income. You have to be double taxed first. The best you can do with a foreign tax credit is break even. The best you can do is go to the United States and say, look, I paid $20 in tax to the foreign government and $30 in tax to you. That's double tax. The statute that Congress enacted says if an American citizen pays tax to two countries, they get a credit for the amount they pay to the foreign entity so that they only pay one tax. And that's exactly what happened here. Wells Fargo didn't get any tax benefits in the way that we typically understand that term. We didn't get some tax credit that just kind of came out of nowhere or was somehow engineered through some machination under the US tax laws. The only thing that we got tax-wise was a credit for a tax that we paid to the foreign government. The money that we paid to the United States for taxes, nobody's challenging. They got to keep that. So in one sense, this case is about whether Wells Fargo has to pay two taxes on the same income. Right now we have. And the reason we asked for the refund is we said, look, we paid that money to the UK and we paid tax on the same money to the United States. We just want to get back the double tax. So yeah, now from Barclay's point of view, they had other things going on. But from the US taxpayers' point of view, which is how the economic substance doctrine is evaluated, this from Wells Fargo's point of view was a fairly simple transaction. We're going to put our assets into a foreign trust, which we could do at any time without objection from the IRS. We're going to put our assets into a foreign trust. And you Barclays are going to pay us $150 million over five years to do that. Because you've got some transaction going on over there. If Barclays abused the British tax system, that's a matter for Barclays and the British taxing authorities. But it's not a matter for the federal government because they don't police extraterritorial activity, right? The economic substance doctrine, as I said, is not to police perceived abuses of foreign taxing systems. The foreign governments can handle that every bit on their own. There's been no abuse of the US tax system. To the extent that the government wants to say, well, the US came out the loser on this because it got less tax revenue, that's the same as in every single case that involves a foreign tax credit. By definition, the United States has to give up some of the money that was taxed. That was Congress's policy choice. That was Congress's choice to say, to encourage people to deal with international business, and Barclays is a foreign bank. We want to encourage people to do that by not exposing them to double taxation. We're going to give them a tax credit for what they pay to the foreign government. That's a policy choice that Congress made, they put that in the statute. And the government hasn't illustrated why this is any different from that. The only downside that they're arguing with the US government here is the same one that exists in any foreign tax credit. Now, the jury determined that there was no economic substance or business purpose outside of the tax considerations, correct? Correct, and this case should not have gone to a jury. That's our position, is that under Frank Lyon, the US Supreme Court case, under this court's cases, the characterization of a transaction for purposes of tax is clearly an issue of law that the court should have decided. And we asked the court to decide this as a matter of law, and the court said, no, we're going to send this to a jury. It should not have gone to the jury. Counsel, assuming that it did properly go to the jury, what deference should this court give to the factual findings of the jury? Well, I think this court's cases are clear, and Frank Lyon is clear that it's de novo review. I don't think that there were facts for the jury to find. Obviously, in general, the rule is that factual findings of a jury are entitled to clear error review. But that's not the case here. This was a legal determination that the judge had to make at the end of the trial. He did so, and that gets de novo review under the Supreme Court's case. So I think all of the issues here are reviewable de novo. I want to emphasize one other thing. This is, pardon me if this is a simplistic question, but I've got to ask it. Can you explain to us, in so many words, if you can, and if you can't, if this is too technical for judges to understand, just tell me. But I'm struggling with, on the UK side of this, this 22% tax credit that Barclays was receiving because of this. What's the basis for that? How does that work? That's a little challenging for me. Sure. There were two main benefits that Barclays got from the UK government. One was a credit for $22 out of every $100 in tax it paid on the trust income. We had to pay tax on the trust income. So did Barclays, because it was a UK entity. So Barclays actually got a credit for the amount of tax that it had paid based on the trust income. So that's one. But the second and most important benefit that Barclays wanted from the UK government was what's called a trading loss deduction. And when you hear about these circular cash flows, that's all something that was going on in England. The English tax system actually respects circular cash flows and gives them credence. What Barclays did is, when it got the money out of the trust, the income from the trust, it would immediately reinvest that money back in the trust. And when it did that, UK tax law gave Barclays a deduction, a trading loss deduction for that. That was the big deal for Barclays, was that it got this trading loss deduction from the UK government, nothing from the United States. And when we talk about circular cash flows, that was all going on in England. England respects those. The United States doesn't, and we've never asked them to. These circular cash flows had absolutely no effect on our US taxation. We didn't pretend that they'd had otherwise, all right? Now, I want to just add briefly on the expense side, because we've been talking about the income. The only question is whether Wells Fargo's payment of tax to the UK is an expense of the transaction that should count against it or be balanced against the income. This court has already answered that question in IES and said no. Payment of foreign tax is, by definition, not pre-tax, all right? It's, by definition, post-tax. That's what this court held in IES, backed up by the Fifth Circuit in Compact, which followed this court, all right? The three circuits that have handled STARS cases, all three of them have departed from this circuit's law on that question, and the Fifth Circuit's law, and they've recognized that, all right? So this court and the Fifth Circuit have already gone one way on this. The other circuits have said, we respectfully disagree and have gone their way. That is the only way that those courts, especially the DC Circuit, was able to decide that the STARS transaction violated the economic substance doctrine, is because it recognized that the income, the BX was income, which is exactly what we say, but then the DC Circuit disagreed with this court when it said, well, we think the tax payment to the UK is an expensive transaction. That's wrong under this court's law. Thank you, Your Honor. Thank you very much. Good morning, and may it please the court. You may proceed. Three other circuits have determined this is not the type of transaction that happens every day. Thank goodness for the U.S. Treasury. They've addressed the STARS transaction. Counsel, would you pull that microphone a little closer to you? Sure. Yes. Yes. Thank you. It was rejected under the economic substance doctrine because it consists of meaningless circular cash flows occurring here in the United States in a transaction that fictionalized international commerce. This is an artificial U.K. tax imposed on U.S. income. The circular cash flows were utilized to transform what should have been U.S. source income into foreign source income for the sole purpose of creating an artificial U.K. tax so that the parties can monetize the value of the foreign tax credit. Judge Kobush, you asked, what is the BX payment? The BX payment is, as the jury found in this case, a tax benefit. It is, as the Second Circuit explained in the Bank of New York case, the device for monetizing and transferring the value of anticipated foreign tax credits because there is no other value in this transaction. The transaction was tax additive for the U.K., and it provided a benefit to Barclays without any economic activity, and it's all being funded by the tax savings realized by the foreign tax credit's claimed economically empty activity. And this is illustrated by the $100 example that the parties used. Now, these questions were all properly put before the jury, and let me address the Frank Lyons standard. The Frank Lyons standard review, which was applied by the three other circuits that have addressed STARS, says that the overall characterization of a transaction is either an economic sham, a legitimate business purpose, a legitimate business transaction is a question of law. But critically, that question of law is based on the particular fact findings. And the particular fact findings are, does the transaction create any sort of economic benefit unrelated to the challenged tax benefits? What are the economic realities of any given cash flow, such as the BX payment in this case, which I'll discuss in a second? And finally, the third major inquiry is, what was the taxpayer motivated by? All these questions were put to the jury, and the jury resolved them against Wells Fargo and in the government's favor. The jury's finding that the BX payment was a tax benefit that was just the sharing of the foreign tax credit value thereof is fully supported by the evidence, days and days of expert testimony, which analyzed the cash flows in this case, as well as Wells Fargo's own candid assessments of what the BX payment was. Wells Fargo referred repeatedly to the BX as the tax benefits in the transaction. One example is on page 25 of the United States appendix, and it said that the BX is the way that the parties are sharing the foreign tax credits. That is on page 183 of the government's appendix. Counsel, what about the IES Industries case? Wells Fargo seems to argue that this court is bound by that precedent. Is that distinguishable? It is very distinguishable, as the other courts who have rejected taxpayers' reliance on it in applying the negligence penalty in Santander and in Salem have concluded. The transaction in IES is nothing like the STARS transaction, other than the fact that in both cases there was a foreign tax credit. The decision itself said that it was based on the specific facts and circumstances of that case, and the facts and circumstances of that case were very different. The court emphasized that there were no artificial features or straw entities in that case. The court emphasized that legitimate business was actually going on. I mean, there is no question in IES that the income at issue there, the dividend income, was economic income. The only issue was how much of that income do you count in the profit analysis, 100 percent of it or just 85 percent of it. There was actually economic risk, and to the other things that distinguish IES, there was no effort in the IES case, as there is here, to disguise the transaction. Remember, in this case, the original justification for the trust was this purported low-cost loan. Well, the jury saw through that, saw that the loan was artificially attached to the trust, was not, in fact, low-cost, but was above market, and was used for the sole purpose of disguising this transaction so that, first, the service wouldn't be able to find it because the BX is hidden on the tax return. Well, Counsel, IES, as I understand it, as I read it, at least stands for the proposition, at least one proposition among many possibly, is that we consider the reasonable possibility of profit apart from taxes. Right. Does the government, does that principle apply in this case, according to the government's view? Yes, that principle does apply. That's the basic standard for profitability under the economic substance doctrine, and in this case, there is no profit once you disregard the BX payments because they are tax benefits. So what under IES specifically do we disregard? We disregard the BX payments, and that's the, we consider that a post-tax benefit to Wells Fargo? Am I following you? Yes, that's correct. It is just the monetization of the foreign tax credits, which is, as the Second Circuit explained. And the court doesn't need to reach, because the court can just affirm the jury on the basis of its findings, that the BX payment is a tax benefit and not economic income. But I would point out that on the foreign tax expense side of the equation, IES did not purport to adopt an across-the-board rule that would preclude foreign tax from being taken into account under the economic substance doctrine. Other courts have distinguished IES because in that case, of course the foreign tax was not the quid pro quo for gaining the income at issue, whereas in this case it is. Wells Fargo had to pay $2 in foreign tax to get $1 in income, and if it didn't pay that tax, it would have to give the BX back. That was part of the make-whole provisions that a district court in this case noted. So unless the court has any questions on the merits of this shelter, I'd like to turn to the negligence penalty. Well, let me ask you this. As I understand the argument that was made a few minutes ago, it is basically that this has economic, the trust part of this had economic substance because Wells Fargo really was taking advantage of an offer of a willing partner in the U.K. who received benefits under U.K. tax laws, and Wells Fargo receives compensation for participation in this arrangement, and that that's the economic benefit. As I understand the argument, it's really that we should focus on U.K. tax laws and the ability of Barclays to benefit from the nature of U.K. tax laws, and that this really doesn't involve the IRS or United States tax laws. Well, it certainly involves the U.S. tax laws because the foreign tax credit claim from the U.S. tax laws is what's funding everybody's, and by everybody I mean the U.K., Barclays, and Wells Fargo benefit in this transaction. This was not a U.K. tax shelter. This tax shelter was tax additive for the U.K. because it's being allowed to tax income, U.S. source income, that it never would have been able to otherwise tax, and in fact Barclays explained that to the U.K. in order to get preapproval of the transaction, explained that yes, Barclays is going to be claiming some U.K. tax benefits, but it's going to leave a small amount of the original tax paid by the U.S. taxpayer with the U.K., and so the U.K. did not challenge the transaction, but it did alert the United States to the fact that it was abusing the U.S. tax system, and again, it's abusing the U.S. tax system. So you say U.K. doesn't challenge because it is a net winner? Exactly, that's exactly right, but it did inform the United States that this was going on, but for that, Treasury probably never would have discovered the STARS transaction because it's so well hidden on the tax return. Now with regard to the penalties in this case, the district court correctly determined that Wells Fargo was liable for the negligence penalty. Counsel, in that regard, don't you think that the Kaiser decision by the U.S. Supreme Court changes the hour deference analysis and application that the district court utilized? I don't think the Kaiser opinion set out what the limitations are. You know, it reaffirmed the fact that there is hour deference, but said, you know, there are certain limitations to its use, and I think the district court's analysis is consistent with the limitations, but I will say this, you don't need to get to the deference because our primary argument is that the text and context of the reasonable basis standard is clear that the taxpayer's conduct is critical. But the district court didn't make any determination in that regard, did they? The district court looked at statute and the reasonable basis language and focused on the language in the regulation that Wells Fargo relies on that a return position that has a reasonable basis, that has a reasonable basis, will excuse negligence, the negligence penalty. But what the regulation says is incorporates, has a reasonable basis within the meaning of dash B3. And dash B3 says, and I'm sorry this sounds technical, this is in page 80 of our addendum, that if a return position is reasonably based on certain authorities, it's reasonably based, then the return position will generally satisfy the reasonable basis standard is, must be based, not could be based. And again, the negligence penalty has been in the tax laws for over a century and the focus has always been on the taxpayer's conduct and nothing in the reasonable basis standard when it was promulgated in 1998 shifts that focus as Treasury made clear in the preamble to the reasonable basis standard. I thought that the district court deferred to the interpretation of the agency rather than determining whether there was a reasonable basis. Well, it did defer to the interpretation the agency has set out in the preamble and that could be a basis, but this is the NOVA review, the question of whether the negligence penalty requires looking at what the taxpayer actually did. And our position is that you don't have to get to the deference analysis of the district court because the language of the regulation, the language of the statute, and this court's own case law in the Shackley's opinion, which makes clear that the focus of the negligence penalty is, did the taxpayer take reasonable care? You can't avoid that. Unless the court has any further questions. I think not. Thank you. Your Honor, I'm officially out of time. Okay, I took up some of your time with my earlier questioning, so take a couple of minutes to wrap up. Your Honor, I appreciate that. Thank you very much. I just want to respond to a few things here. First of all, my friend on the other side has said a couple times that this transaction took money away from the United States FISC, and it was tax additive to the U.K. That is solely because, as part of this transaction, we were asked to and were paid to put assets into a foreign trust. We can do that any time we want. The IRS does not get to step in and say, you, taxpayer, must conduct your affairs in a way that best benefits the U.S. FISC. That's just absolutely not anything that's in the economic substance doctrine or anything else. So when the government complains that, well, the U.K. got a bigger share of taxes than it would have, that is just how these transactions work. There is nothing in the law that allows the IRS to complain that they're not getting enough tax because a taxpayer made a decision to do something completely legal and completely appropriate. And that's where the tax additive part to the U.K. comes in. Second, the federal circuit held squarely that the BX payment in this case is pre-tax profit, and that only makes sense because it was a payment that we got before we paid taxes on it. We had to pay U.S. tax on that amount and don't dispute that we had to do it. Third, counsel tries to distinguish IES and says, well, there are different facts. Surely there are different facts. Every case that comes to this court has slightly different facts. This court lays down rules of law, and the rule in IES was that when you are balancing the income and the expenses of a transaction to decide whether it satisfies the pre-tax profit test, you do not count foreign tax payments on the expense side. And that only makes sense because they are by definition post-tax items. It's absolutely not a pre-tax inquiry. That's what this court said in IES and the Fifth Circuit said in Compact, and the court should continue to follow those. Finally, on the penalty issue, Your Honor is correct that the district court really just deferred under our to the way that the agency, the IRS, was reading the regulation. It's worth noting that that reading is a litigation position. It's never been offered before. It is nowhere ensconced in anything. It does not represent the considered view of the agency as Kaiser required. And, last point, it's not supported by an authorized signature from an appropriate person at the IRS. That's very important because, like Kaiser, that guarantees that it's the agency that is making the decision to impose a penalty. The IRS, in this case, did not impose a penalty. The agency itself declined to. The only time the penalty came into this case was when the lawyers at the DOJ decided to do it after we brought the suit. All right. Thank you, Your Honor. Thank you very much. And I appreciate the indulgence. Thanks. Counsel, thank you for your arguments. The case is submitted. You may stand.